DECISION
{¶ 1} Relator, Debra Andres ("relator"), filed this original action requesting issuance of a writ of mandamus directing respondent, Industrial Commission of Ohio ("the commission"), to vacate its order denying her scheduled-loss compensation for the *Page 2 
alleged loss of sight in her right eye, and to issue an order finding that she is entitled to that compensation.
 {¶ 2} We referred this matter to a magistrate pursuant to Loc. R. 12(M) of this court and Civ. R. 53. The magistrate issued a decision dated April 15, 2008 (attached as Appendix A) denying the requested writ. Relator filed objections to the magistrate's decision, and a memorandum in opposition to those objections was filed by the commission.
 {¶ 3} Relator suffered an industrial injury on February 23, 2003 when she fell on ice in the parking lot of her employer, respondent Westlake Senior Care LLC, Cypress Gardens at Westlake. Relator's claim is allowed for, among other conditions, "posterior vitreous detachment (PVD) of the right eye" and "aggravation of post-traumatic stress disorder."
 {¶ 4} On May 5, 2005, relator was examined by Hernando Zegarra, M.D., who reported that relator complained of floaters in her right eye that blocked her vision, and that the vision in relator's right eye was 20/400. Dr. Zegarra's report also stated that, "The decreased vision in the right eye is in disproportion to the pathology found today. I suspect that a functional component is present." Dr. Zegarra prepared additional reports on May 19, 2005 and June 30, 2005. In those reports, Dr. Zegarra reiterated his conclusion that the vision in relator's right eye was 20/400, equating that to an 80 percent loss of vision.
 {¶ 5} After relator moved for an award of scheduled-loss compensation for 80 percent loss of vision in her right eye, relator was examined by Joseph J. Ross, M.D., at the request of the Bureau of Workers' Compensation. On November 18, 2005, Dr. Ross *Page 3 
prepared a report of his examination. For visual acuity in the right eye, the report states, "Uncorrected: Finger counting." The report further states:
 IMPRESSION: This patient sustained a fall, hitting the back of her head, on 2-23-2003. This resulted in a vitreous separation on the right eye. The vitreous detachment, by itself, would not cause the vision to be decreased. It would result in a floater in the vision which the patient could see as a nuisance. It, however, would not decrease her vision. This patient states that her best vision in her right eye is finger counting on examination today, meaning that she could not even see the big "E" on the chart. However, she took the computerized visual field testing with no false negative or positive errors, meaning that it had very good reliability. In order to be able to do this test, you need at least 20/50 vision. Thus, I do not feel she [is] cooperating with the examination, as I know the vision in her right eye is at least as good as 20/50, yet she states she cannot even see 20/400.
 Thus, I am not able to give a percent of visual loss in this patient. I do feel that the vitreous separation was caused from her accident and is directly related to it. However, this would not decrease her vision, but only cause floaters, which is a nuisance. I feel that this patient is not cooperating with the examination and that she can see much better than she tests on examination today.
 I know that her vision is at least 20/50 in the right eye, and I believe even better than this. Doing OKN (Optokinetic Nystagmus) testing would help to determine better her actual visual acuity in that eye.
 {¶ 6} After a hearing on January 27, 2006, a district hearing officer ("DHO") issued an order denying relator's motion for scheduled-loss compensation. The DHO specifically found the report prepared by Dr. Ross persuasive. The DHO stated that, "Dr. Ross notes that the claimant was able to perform certain visual test[ing] that one could interperet [sic] the results of the testing to conclude that claimant has not loss [sic] sufficient vision to be paid compensation as requested." After a March 14, 2006 hearing, *Page 4 
a staff hearing officer ("SHO") affirmed the DHO order. The SHO order stated that all relevant evidence had been reviewed and considered, and that the SHO relied on Dr. Ross' report in reaching the decision. On April 13, 2006, another SHO issued an order denying relator's administrative appeal of the March 14, 2006 SHO order.
 {¶ 7} In his decision, the magistrate concluded that: (1) Dr. Ross' report was not equivocal; (2) Dr. Ross' report did constitute some evidence upon which the commission could rely in denying relator's requested scheduled-loss compensation; and (3) the March 14, 2006 SHO order complied with State ex rel. Mitchell v. Robbins Myers, Inc.
(1983), 6 Ohio St.3d 481, and its progeny. For her first objection, relator argues:
 The Magistrate erred in finding that the Industrial Commission has the discretion to substitute its own medical conclusion's [sic] and/or inferences from evidence in order to create "some evidence" with which to deny an award of compensation.
 {¶ 8} An equivocal medical opinion cannot constitute some evidence upon which the commission may rely in reaching a conclusion regarding compensation. State ex rel. Eberhardt v. Fixible Corp. (1994),70 Ohio St.3d 649, 640 N.E.2d 815. Pursuant to R.C. 4123.57(B), scheduled-loss compensation for permanent partial loss of vision is not available where the vision loss is less than 25 percent of uncorrected vision. In his report, Dr. Ross stated that he was unable to make any specific finding regarding the percentage of vision lost by relator, concluding that relator's vision in her right eye was at least 20/50.
 {¶ 9} In her objections, relator argues that the magistrate improperly accepted the inference made by the commission that vision of 20/50 means vision loss of less than 25 percent. However, we agree with the magistrate that, although Dr. Ross' report did not specifically conclude that relator's vision loss was less than 25 percent, the report in its *Page 5 
entirety makes it clear that Dr. Ross' conclusion was that relator had not lost sufficient vision to support the requested scheduled-loss compensation.
 {¶ 10} Dr. Ross' report specifically states that, while he believed the vitreous separation was related to relator's industrial injury, he did not believe the separation would result in any loss of vision, but would only result in floaters in the vision. It was not necessary for the report to equate 20/50 vision with vision loss of less than 25 percent, because the report also makes it clear that Dr. Ross' conclusion was that relator's vision was at least 20/50, with the only reason for the lack of a more precise measurement being relator's lack of cooperation in the testing.
 {¶ 11} Thus, the commission did not improperly substitute its own medical judgment for Dr. Ross' when it denied relator's requested scheduled-loss compensation. Consequently, relator's first objection to the magistrate's decision is overruled.
 {¶ 12} In her second objection to the magistrate's decision, relator argues:
 The Magistrate erred in finding that the Industrial Commission did not abuse its discretion by denying Relator a loss of vision award because its decision was supported by "some evidence."
 {¶ 13} In this objection, relator essentially reiterates the argument made in support of her first objection, arguing that Dr. Ross' report was equivocal due to its failure to specifically conclude that relator's vision loss was less than 25 percent, and the only medical evidence in the record regarding the percentage of vision loss was the reports by Dr. Zegarra concluding that relator had suffered a vision loss of 80 percent. Relator argues that the commission improperly rejected Dr. Zegarra's reports without explanation. *Page 6 
 {¶ 14} However, the DHO's decision states that Dr. Ross' report was persuasive based on the conclusion that relator's performance on the visual acuity test showed that relator had not lost sufficient vision to support the requested scheduled-loss compensation. As discussed in our disposition of relator's first objection, Dr. Ross' report was some evidence to support the commission's conclusion, and we cannot say the commission abused its discretion in finding Dr. Ross' report to be more persuasive than the reports prepared by Dr. Zegarra. Consequently, we overrule relator's second objection to the magistrate's decision.
 {¶ 15} Having overruled relator's objections to the magistrate's decision, and having conducted our own independent review of the magistrate's decision, we adopt the decision as our own, and deny the writ requested by relator.
Writ of mandamus denied.
 PETREE and TYACK, JJ., concur. *Page 7 
 APPENDIX A MAGISTRATE'S DECISION Rendered April 15, 2008 IN MANDAMUS. {¶ 16} In this original action, relator, Debra Andres, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her R.C. 4123.57(B) scheduled-loss compensation for the alleged loss of sight of her right eye, and to enter an order granting said compensation. *Page 8 
Findings of Fact: {¶ 17} 1. On February 23, 2003, relator sustained an industrial injury when she fell on ice in her employer's parking lot. On the date of her injury, relator was employed as a licensed practical nurse.
 {¶ 18} 2. The industrial claim is allowed for "posterior vitreous detachment (PVD) of the right eye" and "aggravation of post-traumatic stress disorder," as well as other serious medical conditions.
 {¶ 19} 3. On May 5, 2005, relator was examined by Hernando Zegarra, M.D., who reported:
 * * * She continues to complain of floaters in the right eye that block her vision and impair her overall visual function. She has been seen by Dr. Wysynski at the Cleveland Clinic Lorain who recommended wearing a patch on the right eye to improve function in the left [eye].
 Vision:
 RE: 20/400
 LE: 20/20
 * * *
 Ophthalmoscopy:
 RE: Revealed a posterior vitreous separation with a few floaters and mild epiretinal membrane.
 LE: Unremarkable.
 Clinical impression:
 [One] Posterior vitreous separation, OD
 [Two] Mild epiretinal membrane, macula, OD
 [Three] Possible functional visual loss, OD
 Recommendation:
 The decreased vision in the right eye is in disproportion to the pathology found today. I suspect that a functional component is present. *Page 9 
 {¶ 20} 4. On May 19, 2005, Dr. Zegarra further wrote:
 Debra Andres is a patient of our office with a posterior vitreous separation initially seen on January 2, 2003.
 On her last visit on May 5, 2005, the visual acuity in the right eye was 20/400 (80% loss). At this time, there is no treatment available for her.
 Ms. Andres has been advised by the Cleveland Clinic physicians to wear a patch on the right eye to better adjust to her condition.
 {¶ 21} 5. On June 30, 2005, Dr. Zegarra further wrote:
 This is an amendment to my previous letter of May 19, 2005, in regards to Ms. Andress [sic]. She was seen in our office on February 28, 2003, for a posterior vitreous separation of the right eye related to a work injury on February 23rd.
 The visual acuity on May 5, 2005, has been recorded at the 20/400 level (80% loss). Unfortunately, there is no treatment available to improve vision in this eye.
 The loss of vision and posterior vitreous separation in the right eye is directly related to the work injury that occurred on February 23, 2003.
 {¶ 22} 6. On September 23, 2005, relator moved for an "award for loss of vision (80%) right eye." In support, relator submitted the three reports from Dr. Zegarra dated May 5, May 19, and June 30, 2005.
 {¶ 23} 7. Relator's motion prompted the Ohio Bureau of Workers' Compensation ("bureau") to have relator examined by Joseph J. Ross, M.D., on November 14, 2005. In his report dated November 18, 2005, Dr. Ross states:
 * * * This 53-year-old states that while working as an LPN for Westlake Senior Care, she fell on the ice on 2-23-2003. She states she hit the back of her head, neck and shoulder. She states that she can only see shadows out of the right eye, *Page 10 
that there is a torn tissue in the vitreous of the eye, resulting in the blockage of her vision. She states that she wears a patch over the right [eye] to help the left eye focus.
 * * *
 EYE EXAMINATION:
 Visual Acuity: RE: Uncorrected: Finger counting
 LE: Corrected: 20/20
 * * *
 Fundus Examination: dilated funduscopic exam revealed sharp disc margins with a normal cup-to-disc ratio of .30 to .35 in both eyes. The vessels and periphery were normal. There was a vitreous detachment present in the right eye.
 Visual Field: Humphrey visual field 30-2 testing was normal with full field in both eyes. There is good fixation with no false positive errors or false negative errors on this test.
 IMPRESSION: This patient sustained a fall, hitting the back of her head, on 2-23-2003. This resulted in a vitreous separation on the right eye. The vitreous detachment, by itself, would not cause the vision to be decreased. It would result in a floater in the vision which the patient could see as a nuisance. It, however, would not decrease her vision. This patient states that her best vision in her right eye is finger counting on examination today, meaning that she could not even see the big "E" on the chart. However, she took the computerized visual field testing with no false negative or positive errors, meaning that it had very good reliability. In order to be able to do this test, you need at least 20/50 vision. Thus, I do not feel she [is] cooperating with the examination, as I know the vision in her right eye is at least as good as 20/50, yet she states she cannot even see 20/400.
 Thus, I am not able to give a percent of visual loss in this patient. I do feel that the vitreous separation was caused from her accident and is directly related to it. However, this would not decrease her vision, but only cause floaters, which is a nuisance. I feel that this patient is not cooperating with the examination and that she can see much better than she tests on examination today. *Page 11 
 I know that her vision is at least 20/50 in the right eye, and I believe even better than this. Doing OKN (Optokinetic Nystagmus) testing would help to determine better her actual visual acuity in that eye.
 {¶ 24} 8. On December 21, 2005, the bureau referred relator's motion to the commission for adjudication.
 {¶ 25} 9. Following a January 27, 2006 hearing, a district hearing officer ("DHO") issued an order denying relator's motion. The DHO's order explains:
 Upon review and consideration of all the evidence on the claim file and statements at hearing the claimant shall not be paid compensation based on loss of vision right eye. Dr. Ross is persuasive in his medical opinion that the claimant has not sustaine[d] sufficient vision loss to be paid compensation based upon sc[h]eduled loss of vision.
 Dr. Ross notes that the claimant was able to perform certain visual test[ing] that one could interperet [sic] the results of the testing to conclude that claimant has not loss [sic] sufficient vision to be paid compensation as requested.
 {¶ 26} 10. Earlier, on January 5 and January 12, 2006, relator was again seen by Dr. Zegarra. The record contains Dr. Zegarra's report regarding the January 12, 2006 visit:
 Ms. Andress [sic] was seen in our Beachwood office on January 12, 2006, for additional visual testing.
 Vision:
 RE: 6/200
 LE: 20/25
 * * *
 Visual fields in the right eye show a spiral response with no central scotoma. The left eye was within normal limits.
 * * * *Page 12 
 Clinical Impression:
 [One] Posterior vitreous separation with vitreous floaters, OD
 [Two] Minimal epiretinal membrane, OD
 [Three] Functional visual loss, OD
 Ms. Andres has an 80% loss of vision in the right eye that cannot be corrected by corrective lenses or surgical means. The loss of vision is due to a functional component, which means that she has an actual loss of vision due to her allowed psychological disorder probably related to aggravation of preexisting post traumatic stress disorder.
 {¶ 27} 11. It is not clear whether Dr. Zegarra's report regarding the January 12, 2006 visit was before the DHO.
 {¶ 28} 12. Apparently, following the January 27, 2006 hearing, relator's counsel requested an additional report from Dr. Zegarra. By letter dated March 10, 2006, Dr. Zegarra responded:
 In response to your inquiry regarding the claim denial of 1/27/06[,] I had the opportunity to see Debra on January 5 and January 12, 2006, and also read the report from Dr. Ross. He did an excellent evaluation on Debra and found inconsistencies between the level of visual acuity obtained with the Snellen chart and the responses to the visual field testing with no false-negatives or positive errors.
 In view of these findings, I felt it would be of interest for Debra to have a more comprehensive evaluation of her visual function to first determine the true level of visual acuity and the cause of the decreased vision.
 Ms. Andres was seen in our office and agreed with my recommendation.
 On January 6, 2006 [sic], visual acuity in the right eye with correction improved to 20/200. The left eye remained at 20/20. Near vision without correction was 20/200 in the right eye and 20/20 in the left. *Page 13 
 External examination, extraocular muscles, and pupils were all within normal limits. The Amsler test was abnormal in the right eye. The anterior segment was unremarkable.
 Ophthalmoscopy of the right eye showed a posterior vitreous separation with a medium-sized floater noted nasal to the visual axis. The optic nerve and retinal vasculature were normal. The macular area revealed absent foveal reflex with minimal epiretinal membrane formation above the fovea.
 The left fundus was unremarkable.
 Fluorescein Angiogram Report:
 Fluorescein angiogram performed today in both eyes was within normal limits.
 {¶ 29} 13. Following a March 14, 2006 hearing, a staff hearing officer ("SHO") issued an order stating:
 The order of the District Hearing Officer, from the hearing dated 01/27/2006, is affirmed. Therefore, the claimant's motion, filed 09/23/2005, is denied.
 Claimant's request for an award under the provisions of Ohio Revised Code Section 4123.57(B) for eighty percent loss of vision of the right eye is denied.
 All relevant evidence has been reviewed and considered. The Staff Hearing Officer has relied upon the 11/18/2005 report of Dr. Ross in making this decision.
 {¶ 30} 14. On April 13, 2006, another SHO issued an order refusing relator's administrative appeal from the SHO's order of March 14, 2006.
 {¶ 31} 15. On September 17, 2007, relator, Debra Andres, filed this mandamus action.
Conclusions of Law: {¶ 32} Three issues are presented: (1) Is the report of Dr. Ross equivocal? (2) If the report is not equivocal, does it nevertheless fail to constitute some evidence upon *Page 14 
which the commission can rely to deny compensation? and (3) Does the SHO's order of March 14, 2006 comply with State ex rel. Mitchell v.Robbins Myers, Inc. (1983), 6 Ohio St.3d 481.
 {¶ 33} The magistrate finds: (1) the report of Dr. Ross is not equivocal; (2) the report does constitute some evidence upon which the commission can and did rely; and (3) the SHO's order of March 14, 2006 complies with Mitchell and its progeny.
 {¶ 34} R.C. 4123.57(B) provides a schedule of compensation for enumerated losses. Pertinent here, the statute states:
 For the loss of the sight of an eye, one hundred twenty-five weeks.
 For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. "Loss of uncorrected vision" means the percentage of vision actually lost as the result of the injury or occupational disease.
 {¶ 35} The magistrate shall address the first two issues together. Equivocal medical opinions are not evidence. State ex rel. Eberhardt v.Flxible Corp. (1994), 70 Ohio St.3d 649, 655. Equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Id.
 {¶ 36} Citing Eberhardt, relator argues that the report of Dr. Ross is equivocal. Relator also argues that the report of Dr. Ross cannot be some evidence that relator has vision loss of less than 25 percent or no vision loss at all. *Page 15 
 {¶ 37} In his report, Dr. Ross states: "I am not able to give a percent of visual loss in this patient." Emphasizing this statement, relator argues that Dr. Ross, in effect, admits that he was unable to render a medical opinion as to whether relator has a compensable loss of sight in her right eye. The magistrate disagrees with relator's interpretation of Dr. Ross' statement.
 {¶ 38} In his report, Dr. Ross goes on to say that he feels that relator is not cooperating with the examination. He explains that the visual acuity in her right eye must be at least 20/50 because she performed the computerized visual field testing with no false negative or positive errors, meaning that the testing had good reliability. According to Dr. Ross, in order to do the test, you need at least 20/50 vision.
 {¶ 39} Significantly, on the visual acuity part of the eye examination, relator stated that "she can only see shadows out of the right eye." Apparently, on that basis, Dr. Ross recorded the visual acuity in the right eye as "Uncorrected: Finger counting." In effect, Dr. Ross opined that relator's right eye visual acuity is at least 20/50 and not at "Finger counting."
 {¶ 40} While Dr. Ross never directly states that relator has no visual loss or has a visual loss less than 25 percent, the commission was free to conclude that Dr. Ross' report is indeed some evidence of visual loss of less than 25 percent. Relator does not claim that she can be found to have a visual loss of 25 percent or greater when the relied upon report indicates that right eye visual acuity is at 20/50.
 {¶ 41} Relator seems to suggest that because the record does not tell us what visual acuity relator must have in order to be at 25 percent vision loss, we must *Page 16 
conclude that Dr. Ross' opinion that vision is at least 20/50 is not significant or determinative. Relator's suggestion lacks merit.
 {¶ 42} Again, the commission can easily infer under the circumstances that Dr. Ross' finding that right eye visual acuity is at least 20/50 is medical evidence that whatever vision loss relator may have is not at 25 percent or greater, given that there is no contention that visual acuity of 20/50 could produce a 25 percent vision loss.
 {¶ 43} Based upon the above analysis, it is clear that Dr. Ross' statement that he is not able to give a percent of visual loss is not inconsistent with the conclusion the commission draws from the report — that relator does not have a compensable R.C. 4123.57(B) vision loss.
 {¶ 44} In the second to last paragraph of his report, Dr. Ross states: "Doing OKN (Optokinetic Nystagmus) testing would help to determine better her actual visual acuity in that eye." Citing this statement, relator suggests that Dr. Ross is expressing uncertainty as to his opinion that relator has at least 20/50 visual acuity in the right eye. The magistrate disagrees.
 {¶ 45} Pointing out that OKN testing might better determine visual acuity is not an expression of uncertainty that relator demonstrated at least 20/50 visual acuity during the computerized visual field testing.
 {¶ 46} In short, Dr. Ross' report is not equivocal — He did not repudiate an earlier opinion, he did not render contradictory or uncertain opinions, and there are no ambiguous statements to clarify.Eberhardt.
 {¶ 47} Turning to the third issue, in Mitchell, the court announced that the commission "must specifically state which evidence and only that evidence which has *Page 17 
been relied upon to reach their conclusion, and a brief explanation stating why the claimant is or is not entitled to the benefits requested." Id. at 483-484.
 {¶ 48} In State ex rel. DeMint v. Indus. Comm. (1990),49 Ohio St.3d 19, 20, the court clarified that "Mitchell mandates citation of only that evidence relied on. It does not require enumeration of all evidenceconsidered." (Emphasis sic.)
 {¶ 49} In State ex rel. Noll v. Indus. Comm. (1991),57 Ohio St.3d 203, the court had occasion to apply the Mitchell rule to a decision of the commission adjudicating a permanent total disability application, and particularly to the nonmedical analysis of the decision. The syllabus of Noll states:
 In any order of the Industrial Commission granting or denying benefits to a claimant, the commission must specifically state what evidence has been relied upon, and briefly explain the reasoning for its decision.
 {¶ 50} In State ex rel. Bell v. Indus. Comm. (1995),72 Ohio St.3d 575, 577, the court held that neither Mitchell nor Noll require the commission to set forth reasons for finding one report more persuasive than another.
 {¶ 51} According to relator, the SHO's order of March 14, 2006 violates Mitchell and it progeny because allegedly the SHO failed to explain the reasoning for the decision and also because the SHO failed to explain why he found the report of Dr. Ross more persuasive than the reports of Dr. Zegarra.
 {¶ 52} Undeniably, the SHO's order states exclusive reliance upon the report of Dr. Ross. There is no explanation in the order as to why Dr. Zegarra's reports were rejected or why the report of Dr. Ross was found to be persuasive. There is no requirement that the order do so.Bell. *Page 18 
 {¶ 53} The DHO's order of January 27, 2006, which was administratively affirmed, provides an explanation as to how the DHO relied upon the report of Dr. Ross to reach his conclusion that the compensation should be denied:
 Dr. Ross notes that the claimant was able to perform certain visual test[ing] that one could interperet [sic] the results of the testing to conclude that claimant has not loss [sic] sufficient vision to be paid compensation as requested.
 {¶ 54} To the extent that any reasoning was required beyond the stated reliance upon the report of Dr. Ross, the DHO's order supplies the reasoning. There was no requirement that the reasoning be repeated in the SHO's order.
 {¶ 55} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1